# 21-10729

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

### UNITED STATES OF AMERICA,
Plaintiff-Appellee

v.

### PAUL MICHAEL MALAGERIO,
Defendant-Appellant

---

On Appeal from the United States District Court
For the Northern District of Texas
Lubbock Division
District Court No. 5:20-CR-154-H-1

---

### APPELLEE'S BRIEF

---

Chad E. Meacham
United States Attorney

Leigha Simonton
Assistant United States Attorney
Texas Bar No. 24033193
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659-8600
leigha.simonton@usdoj.gov

Attorneys for Appellee

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Oral argument would not assist the Court in this appeal.  The district court denied Malagerio's suppression motion after a lengthy hearing and detailed fact findings and legal analysis.  Malagerio's arguments rest largely on assertions that run contrary to the district court's fact findings, to which this Court gives great deference, and Supreme Court and Fifth Circuit caselaw. The Court can easily affirm without oral argument.

# **TABLE OF CONTENTS**

**Page**

STATEMENT REGARDING ORAL ARGUMENT ....................................i

TABLE OF AUTHORITIES ..........................................................iv

STATEMENT OF JURISDICTION..............................................1

STATEMENT OF THE ISSUES ..................................................1

STATEMENT OF THE CASE .....................................................2

    1.    Federal officers executing an immigration arrest warrant on Malagerio for overstaying his visa find three firearms at his home, and the U.S. Attorney's Office charges him with possessing firearms as an illegal alien. ..........................................................2

    2.    Malagerio moves to suppress the firearms and statements he made on the day of his arrest, and the district court holds an evidentiary hearing ......................................................3

    3.    After hearing all of the testimony and considering all of the evidence, the district court denies the suppression motion on the basis of detailed fact findings and credibility determinations as well as legal conclusions based on Supreme Court and Fifth Circuit law. ......................................................15

    4.    A jury convicts Malagerio, and the court imposes a 28-month sentence ....................................................17

SUMMARY OF THE ARGUMENT .....................................188

ARGUMENT AND AUTHORITIES.....................................199

    The district court—based largely on fact findings and credibility determinations to which this Court owes great deference— properly denied Malagerio's suppression motion. .....................19

    1.    The district court properly found that the officers did not illegally seize Malagerio in violation of the Fourth Amendment ....................................................21

A.  Malagerio has not shown that the district court erred, much less clearly erred, in finding that officers did not seize Malagerio within his home or curtilage .............................................................. 21

B.  Alternatively, the district court properly found that the good-faith exception applied to allow the officers to seize Malagerio pursuant to the administrative warrant .................................................................. 28

C.  Assuming the good-faith exception does not apply, the seizure was nevertheless legal ............................ 38

2.  Malagerio consented to the search of his home, resulting in the discovery of three firearms ...................................... 40

CONCLUSION .......................................................................... 45

CERTIFICATE OF SERVICE .................................................... 45

CERTIFICATE OF COMPLIANCE ......................................... 46

# TABLE OF AUTHORITIES

**Federal Cases**                                                      **Page(s)**

*Abel v. United States*, 362 U.S. 217 (1960) ................................................ *passim*

*Arnold v. Williams*, 979 F.3d 262 (5th Cir. 2020) ........................................... 22

*Bruce v. Beary*, 498 F.3d 1232 (11th Cir. 2007) ............................................. 33

*California v. Hodari D.*, 499 U.S. 621 (1991) ............................................. 24, 25

*City of El Cenizo, Texas v. Texas*, 890 F.3d 164 (5th Cir. 2018) ........................ 37

*Club Retro, L.L.C. v. Hilton*, 568 F.3d 181 (5th Cir. 2009) .................... 33, 35, 37

*Collins v. Virginia*, 138 S. Ct. 1663 (2018) ..................................................... 27

*Davis v. United States*, 564 U.S. 229 (2011) ................................................... 29

*Evans v. Lindley*, No. 21-20118, 2021 WL 5751451 (5th Cir. Dec. 2, 2021) .... 27

*Illinois v. Krull*, 480 U.S. 340 (1987) .............................................................. 32

*Louis v. Blackburn*, 630 F.2d 1105 (5th Cir. 1980) ......................................... 20

*New York v. Burger*, 482 U.S. 691 (1987) ........................................................ 35

*Puckett v. United States*, 556 U.S. 129 (2009) ................................................. 26

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) ............................................. 41

*Terry v. Ohio*, 392 U.S. 1 (1968) ............................................................. *passim*

*United States v. Aguilar*, 973 F.3d 445 (5th Cir. 2020) ................................ 29, 33

*United States v. Basey*, 816 F.2d 980 (5th Cir. 1987) ....................................... 20

*United States v. Bass*, 996 F.3d 729 (5th Cir. 2021) ........................................ 42

iv

**Federal Cases, continued** **Page(s)**

*United States v. Cherna*, 184 F.3d 403 (5th Cir. 1999)......................................28

*United States v. Dunigan*, 555 F.3d 501 (5th Cir. 2009) ...................................38

*United States v. Dunn*, 480 U.S. 294 (1987) ...................................................27

*United States v. Gibbs*, 421 F.3d 352 (5th Cir. 2005)..................................19, 20

*United States v. Huerta*, 770 F. App'x 169 (5th Cir. 2019) ..............................20

*United States v. Hunt*, 893 F.2d 1028 (9th Cir. 1990) .....................................32

*United States v. Johnson*, 994 F.2d 740 (10th Cir. 1993) .................................33

*United States v. Kelley*, 981 F.2d 1464 (5th Cir. 1993) ....................................42

*United States v. Koziel*, 954 F.2d 831 (2d Cir. 1992) .......................................39

*United States v. Kreczmer*, 636 F.2d 108 (5th Cir. Unit B 1981).......................20

*United States v. Leon*, 468 U.S. 897 (1984)...............................................28, 29

*United States v. Lucas*, 499 F.3d 769 (8th Cir. 2007)...................................32, 40

*United States v. Marin-Hipolito*, 434 F. App'x 346 (5th Cir. 2011).........42, 43, 44

*United States v. McKinnon*, 681 F.3d 203 (5th Cir. 2012)................................20

*United States v. Montgomery*, 777 F.3d 269 (5th Cir. 2015) .............................44

*United States v. Route*, 104 F.3d 59 (5th Cir. 1997) ........................................39

*United States v. Scroggins*, 599 F.3d 433 (5th Cir. 2010).......................20, 21, 41

*United States v. Scully*, 951 F.3d 656 (5th Cir. 2020) .......................................29

**Federal Cases, continued**                                    **Page(s)**

*United States v. Smith*, 1994 WL 57613 (5th Cir. Feb. 17, 1994) .......... 31, 32, 38

*United States v. Thomas*, 973 F.2d 1152 (5th Cir. 1992).................................. 35

**Federal Statutes and Rules**

18 U.S.C. § 3231 ........................................................................... 1

28 U.S.C. § 1291 ........................................................................... 1

Fed. R. App. P. 4(b) ...................................................................... 1

## STATEMENT OF JURISDICTION

This is a direct appeal from a conviction in a criminal case.  The district court had jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction under 28 U.S.C. § 1291.  The district court entered judgment on July 16, 2021, and Malagerio timely filed his notice of appeal the same day.  Fed. R. App. P. 4(b).  (ROA.13-14.)

## STATEMENT OF THE ISSUES

1.    Did the district court correctly conclude that officials who were executing an administrative arrest warrant for an immigration violation did not violate the Fourth Amendment in the way in which they apprehended Malagerio?  This includes the following questions:

A.    Has Malagerio demonstrated that the district court clearly erred by finding, based on testimony and evidence presented at the suppression hearing and credibility findings the court made based on that record, that authorities executing an administrative warrant did not seize him until he was outside of his home and curtilage?

B.    Even if this Court were to conclude, contrary to the district court, that authorities seized Malagerio within his home or curtilage, did the officials rely in good faith on the administrative arrest warrant in seizing him in such a manner when binding Supreme Court precedent allows such a seizure and,

1

contrary to Malagerio's claim, the officials did not use the warrant as a

subterfuge to conduct a criminal investigation?

2.     Did the district court plainly err in finding that Malagerio voluntarily

consented to the search of his home, resulting in the authorities' discovery of

three firearms, when multiple officers testified that he voluntarily consented,

and he signed a written consent form?[1]

## STATEMENT OF THE CASE

### 1.     Federal officers executing an immigration arrest warrant on Malagerio for overstaying his visa find three firearms at his home, and the U.S. Attorney's Office charges him with possessing firearms as an illegal alien.

In October 2020, Homeland Security Investigations (HSI) received

information that Paul Malagerio, a Canadian citizen, was residing unlawfully

in the Levelland, Texas area.  (ROA.1231.)  HSI forwarded the information to

ICE Enforcement and Removal Operations (ICE-ERO), which determined

that Malagerio had last entered the United States several years before and that

he had overstayed his B2 nonimmigrant visitor visa.  (ROA.1230.)  It then

---

[1] The government does not believe that Malagerio is appealing the district court's ruling that Malagerio was Mirandized before providing statements to the officers related to his firearms.  (*See* Brief at 2-3 (Malagerio's Issues Presented).)  But if this Court interprets Malagerio's brief as sufficiently raising this issue, the record, as discussed in this brief's Statement of Facts, strongly supports that he was Mirandized and waived those rights before making such statements.

issued an administrative warrant for Malagerio's arrest so that deportation proceedings could begin.  (ROA.1230.)

On November 3, 2020, ICE-ERO and HSI officers arrested Malagerio at his Levelland RV residence.  (ROA.1230.)  They found three firearms: an AR-15, .223 caliber rifle; a 12-gauge shotgun; and a 9mm pistol.  (ROA.1231.)  A federal grand jury charged him with possessing firearms as an illegal alien. (ROA.30, 1230.)

## 2. Malagerio moves to suppress the firearms and statements he made on the day of his arrest, and the district court holds an evidentiary hearing.

Malagerio moved to suppress the evidence the federal officers recovered and the statements he made on the day of his arrest.  (ROA.53.)  He contended that the authorities searched his home without a warrant, consent, or exigent circumstances, and that they did not provide *Miranda* warnings before questioning him.  (ROA.53-67.)  The government opposed the motion, explaining that authorities arrested him pursuant to an immigration warrant, that they warned him of his *Miranda* rights, and that Malagerio both consented verbally and in writing to the search of his residence.  (ROA.85-95.)

The district court held a suppression hearing on February 17, 2021. (ROA.433.)  Three federal officials—ICE-ERO Deportation Officer Dusty Rowden, HSI Agent Tim Raymond, and HSI Resident Agent-in-Charge Charles Cobb—testified at the hearing, along with Malagerio.  (ROA.433-34.)

The government also presented several exhibits, including the arrest warrant, the consent-to-search form, bodycam video of Malagerio's initial seizure, and recorded jail calls after he was apprehended.  (ROA.1126-49.)

The testimony and evidence showed that, on October 15, 2020, Rowden's supervisor, Senior Detention Deportation Officer David Harshbarger, received information from Keith Atkins, an ICE-ERO Assistant Field Office Director, that Malagerio had overstayed his visa in the United States.  (ROA.440-44, 1126-27.)  Atkins had received the information from an HSI special agent in Dallas, who explained in an email to Atkins that HSI had received information indicating that Malagerio had been "causing problems" and needed to be removed and that based on some initial investigation, Malagerio was an overstay.  (ROA.1126-27.)  The email also requested that Atkins "see what Fug Ops [(Fugitive Operations)] in Lubbock could do with [Malagerio]."  (ROA.1126-27.)  The Fugitive Operations team arrests and investigates illegal aliens in the United States.  (ROA.443.)

After receiving this assignment, Deportation Officer Rowden began an investigation into whether Malagerio was a visa overstay and found that Malagerio entered the United States several years before on a six-month visa and was currently residing in Levelland.  (ROA.449-51.)  Based on this information, Rowden requested an I-200 administrative warrant for the arrest

of a deportable alien, and Harshbarger issued the warrant based on

Harshbarger's determination that probable cause existed that Malagerio was an

alien illegally and unlawfully in the United States:

---

**U.S. DEPARTMENT OF HOMELAND SECURITY**     Warrant for Arrest of Alien

File No.   216 644 190

Date:   11/03/2020

**To:**   **Any immigration officer authorized pursuant to sections 236 and 287 of the Immigration and Nationality Act and part 287 of title 8, Code of Federal Regulations, to serve warrants of arrest for immigration violations**

I have determined that there is probable cause to believe that _____ MALAGERIO, PAUL _____ is removable from the United States. This determination is based upon:

☐ the execution of a charging document to initiate removal proceedings against the subject;

☐ the pendency of ongoing removal proceedings against the subject;

☐ the failure to establish admissibility subsequent to deferred inspection;

☑ biometric confirmation of the subject's identity and a records check of federal databases that affirmatively indicate, by themselves or in addition to other reliable information, that the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law; and/or

☑ statements made voluntarily by the subject to an immigration officer and/or other reliable evidence that affirmatively indicate the subject either lacks immigration status or notwithstanding such status is removable under U.S. immigration law.

**YOU ARE COMMANDED** to arrest and take into custody for removal proceedings under the Immigration and Nationality Act, the above-named alien.

_____
(Signature of Authorized Immigration Officer)

D.1394 HARSHBARGER - SDDO
_____
(Printed Name and Title of Authorized Immigration Officer)

**Certificate of Service**

I hereby certify that the Warrant for Arrest of Alien was served by me at _____ Lubbock, Texas _____
(Location)

on _____ MALAGERIO, PAUL _____ on _____ November 3, 2020 _____, and the contents of this
(Name of Alien)          (Date of Service)

notice were read to him or her in the _____ ENGLISH _____ language.
(Language)

D 7846 ROWDEN
DO
_____          _____
Name and Signature of Officer          Name or Number of Interpreter (if applicable)

Form I-200 (Rev. 09/16)

(ROA.1129 (GX 3).)

Before executing the arrest warrant and to identify any potential safety threats the arrest might pose to officers, Deportation Officer Rowden conducted surveillance on Malagerio and determined that Malagario lived in an RV on a property called Whitley Farms, owned by Jason Whitley. (ROA.451, 458.)  He also reviewed Malagerio's social media and determined from a 2017 photo that, at least in 2017, Malagerio had something that looked like a pistol or possibly a tranquilizer gun holstered on his hip and that he worked with big cats, (ROA.458-60, 508):



**Paul Malagerio**
Jun 4, 2017 · 🌐

👍❤️ 59          7 Comments

(ROA.1137 (GX 8).)  Although the photo indicated that Malagerio might possess a firearm, Deportation Officer Rowden proceeded with his plan to execute the administrative arrest warrant rather than seeking a search warrant for a potential federal criminal violation because the photo was from 2017, and he had no evidence confirming that the item in the photo was actually a firearm rather than a tranquilizer gun.  (ROA.507-11, 530.)

Because of the concerns that Malagerio might have a firearm and that big cats might be on the property or in his RV, officials from ICE-ERO, HSI, the Lubbock Fugitive Operations Team, and State Game Wardens participated in the planning and execution of Malagerio's arrest pursuant to the administrative warrant.  (ROA.460-61.)  Deportation Officer Rowden led the team because the operation's focus was on arresting Malagerio for deportation proceedings, with HSI special agents playing a supportive role in case of potential criminal activity that would result in a criminal case.  (ROA.515.)

On the morning of November 3, 2020, Deportation Officer Rowden, Agent Raymond, and Agent-in-Charge Cobb, among others, set about to execute the warrant and arrest Malagerio.  These authorities first met Whitley at the gate to Whitley's property and told him they were "looking for Paul Malagerio."  (ROA.462.)  Whitley pointed in the direction of Paul Malagerio's trailer and said he was "over there."  (ROA.462.)  They asked if Whitley

8

would "consent [for them] to come onto the property and speak with Mr. Malagerio, and he agreed." (ROA.462.)

The officials went to Malagerio's trailer, and Officer Rowden and another agent knocked on the door, announced themselves as Immigration and Customs Police, and asked him to come to the door. (ROA.466, 496.) Malagerio asked "who is it?" and "kept taking his time to come to the door." (ROA.466-67.) Officer Rowden viewed this encounter as a "knock and talk," said that he asked Malagerio to come to the door rather than commanded him, and testified that Malagerio could have refused to come to the door if he had wanted. (ROA.496, 498, 516, 533, 540.)

After about 60 to 90 seconds, Malagerio opened the door and said, "hey, what's this all about?" (ROA.467, 517.) For officer safety and given the potential presence of a firearm or big cats, Deportation Officer Rowden and other officials, displaying their weapons, told him to put his hands up. (ROA.468.) Malagerio did not comply immediately, beginning to put his hands up but then putting them down to adjust his shirt, finally complying as he moved toward his truck. (ROA.1149 (GX 14).) Once he was near the hood of his truck, the officers handcuffed him for safety reasons. (ROA.467-68, 517, 540-41.) He asked what this was about, and the officers told him that they

were there for "[i]mmigration violations." (ROA.468.) Malagerio responded repeatedly, "I'm not illegal; I'm Canadian." (ROA.468.)

Officer Rowden asked some basic biographical questions and then read Malagerio his *Miranda* rights off a card that he kept in his wallet. (ROA.469, 517, 528, 540; *see also* ROA.800 (trial testimony).) Malagerio said he understood his rights and that he would talk with them. (ROA.470, 541.) Agent Raymond testified that, at this time, Malagerio was "very cordial, very polite." (ROA.518.) As one of the officers testified, Malagerio "seemed to know that he had some immigration issues" and "just wanted to make it all go away," so he "waived his *Miranda* rights and was willing to answer any questions that we had" and "cooperate fully with [the] investigation." (ROA.518.)

Deportation Officer Rowden first asked Malagerio "if he had any of his Canadian documents," and Malagerio said his Canadian passport was in the trailer. (ROA.470.) Rowden also asked if Malagerio had any firearms, and Malagerio said he had three in the trailer. (ROA.471, 519.) Malagerio did not "think it was a problem to possess them [because] he lived in the State of Texas." (ROA.519, 523.) Finally, Rowden asked "if there w[ere] any exotic animals inside the trailer" and Malagerio said no, they were kennelled. (ROA.471.)

Officer Rowden asked if they could search Malagerio's trailer for the firearms and identification documents, and Malagerio consented. (ROA.471, 506, 519, 523, 534, 542; *see also* ROA.801-02 (trial testimony).) Malagerio's demeanor at this point was "calm," "[v]ery cooperative," and "[h]elpful." (ROA.471, 516, 523.) Agent-in-Charge Cobb testified that Deportation Officer Rowden's consent to search was "very thorough" and that Cobb was "surprised [they were having a suppression hearing] because not only did [Officer Rowden] ask [for permission to search], he asked several times if he had permission to move a pillow or to move a box." (ROA.519.)

Agent-in-Charge Cobb "also asked for consent to enter the trailer." (ROA.519, 542.) Cobb specifically remembered asking, "Listen, do you consent for these guys to go into your trailer and retrieve these items, these firearms, these papers, the passport? Do you consent for us to go in there and get these things?" (ROA.542; *see also* ROA.1016 (trial testimony).) Malagerio responded, "Yes, yes, yes; come inside, I'll show you where they're at." (ROA.542.) Agent Raymond likewise recalled that Malagerio "[a]bsolutely" gave verbal consent for them to search the trailer. (ROA.519-20, 543.) The only concern Malagerio expressed was that "he had some little kittens that were running around inside the trailer, and he wanted to make sure none of

11

those got out." (ROA.519.)  At some point that day, Malagerio also signed a

written consent to search memorializing his verbal consent:

---

**U.S. DEPARTMENT OF HOMELAND SECURITY**
CONSENT TO SEARCH

Investigative Case Number:        Date of Search: (mmddyyyy)        Time of Search:
                                  (mmddyyyy)                        (24 Hour)

[ ][ ][ ][ ][ ][ ][ ][ ][ ]      [1][0][3][2][2][2][0]            [0][7][1][1]

ENGLISH
I, _Paul Malagerio_____, have been
requested to consent to a search of my residence for wanted persons, guns,
drugs, or any other illegal contraband.

I authorize these Law Enforcement Officers present to conduct the search.

ESPANOL:
Por la presente autorizo al funcionario (o a los funcionarios)
_____ y _____ a efectuar un registro
completo del local que ocupo para personas, armas, drogas o otro contrabando
ilegal.

X _Paul Mman_____                    _11/3/2020_____
SIGNATURE/ FIRMA                        DATE/ FECHA

LOCATION: _Levelland, Tx  1920 13th St.  79336_____

OFFICER: _D. Rower_____

OFFICER NAME / SIGNATURE                _Deportation Officer_
                                        TITLE

---

(ROA.472-73, 1131 (GX 5).)

Malagerio and three officers went into the trailer, and Malagerio "point[ed] out where each of the firearms and the identification documents were located." (ROA.472, 505.) With his body movements, he "led [them] to his immigration documents and a pistol that were located on the right side of the trailer" near the kitchen, and then he led them "to the left side of the trailer" where "the bedroom was" and said "that he had the AR-15 and the shotgun in the bedroom." (ROA.522, 536, 543-44.) Malagerio continued to be "calm" and "very cooperative." (ROA.523, 543-44.) He believed that he was legally able "to possess those firearms for some reason, so he wasn't really nervous about the fact that he had them." (ROA.523.) At no point did he demand to see a search warrant. (ROA.506, 523, 526, 544.)

Malagerio told the officers that his passport was in a lunchbox, and the officers found the lunchbox, which contained Malagerio's "passport, some tiger whiskers, money, two Canadian ID documents, as well as a pistol." (ROA.474.) Malagerio said the other two firearms were in his bedroom and pointed them out; the agents found the shotgun and AR-15 style rifle under the mattress. (ROA.475.) During this time, Malagerio continued to be "[v]ery calm and cooperative." (ROA.476.)

After finishing the search, Deportation Officer Rowden transported Malagerio back to Rowden's office so he could "process [Malagerio] . . . for

13

being a B2 non-immigrant overstay." (ROA.476-77, 523.) While Malagerio

sat in the office, and Rowden allowed Malagerio to make "ten plus" phone

calls on Malagerio's cell phone. (ROA.477, 527.) Once Officer Rowden was

done with the processing paperwork, authorities took Malagerio to the

Lubbock jail on an immigration hold, (ROA.477-78, 524), and Agent

Raymond and Officer Rowden went to the U.S. Attorney's Office and

provided information to support a charge for possessing firearms as an illegal

alien based on the firearms they had just recovered. (ROA.523.) While

Malagerio was in the Lubbock jail, he made calls to his friends and indicated

that he was "cooperative" with the officers and "g[ave] the weapons up."

(ROA.525-26.) He also said that, during the encounter, "[t]hey were very nice

to [him]." (ROA.526.)

After the government presented these officers' testimony and several

exhibits, Malagerio testified, and his statements differed markedly from that of

the officers. He claimed that he was "terrified" when they knocked on his

door and that the three officers were lying—no one ever read him his *Miranda*

rights and therefore he did not waive his rights. (ROA.553-55, 567-68.) He

also said that, right after they handcuffed him, he saw them enter the RV

without his consent. (ROA.556-58.) He further claimed that he asked if they

had a search warrant and they did not answer him the first time. (ROA.558.)

Malagerio said that they took him inside the RV so he could help them find his passport, and when he walked in, he found the kitchen cabinets open and saw that the partition to his bedroom had also been pushed open, indicating to him that they had rummaged around before he walked in.  (ROA.559-60.)  Finally, Malagerio claimed that he never gave them consent to search for the firearms and instead asked again whether they had a warrant.  (ROA.560.)  This time, they responded no, but they could get one.  (ROA.560.)

**3.     After hearing all of the testimony and considering all of the evidence, the district court denies the suppression motion on the basis of detailed fact findings and credibility determinations as well as legal conclusions based on Supreme Court and Fifth Circuit law.**

Malagerio was the defense's only witness.  After he testified, the court heard extensive argument from both parties and noted that it had "watched the video [of the arrest] multiple times."  (ROA.602.)  It then denied the motion and made several factual findings, including:

- Each of the law enforcement witnesses—Deportation Officer Rowden, Agent Raymond, and Special Agent-in-Charge Cobb—"testified credibly," "[t]heir testimony was consistent with one another," and "all of their testimony was corroborated, at least in part, by the documentary evidence" and the "video evidence."  (ROA.607-08.)

- Malagerio did not testify credibly—"[h]is testimony was evasive often," and the government "successfully impeach[ed] at least one of his statements by his own jail calls. . . . [H]e wouldn't admit to even things that should be irrefutable, like his own statements on a call, when he says, you know, 'I heard my voice say that today, but.'"  The court "found it to be very evasive and impeached, which undermines his credibility."  (ROA.608.)

15

- Malagerio "was not arrested in his home. . . . [T]he officers went to his door, knocked on the door, announced who they were, asked him to come out, and he did come out. The video very clearly" showed that Malagerio was not arrested "at the threshold. The video clearly shows he stepped out. He took multiple steps away from his trailer and was then arrested. So to the extent the [defense] argument relies on the fact that he was [arrested] in his home, . . . it fails on a false assumption of fact." (ROA.609.)

- "[T]he officers acted reasonably in approaching the situation as they approached it, essentially with guns unholstered while executing this. There are some unique facts here . . . if we have tigers and lions . . . possibly around [in] addition to Intel indicating that this person was illegally present in the United States and had a firearm. Under . . . that constellation of circumstances, I don't think it was unreasonable for them operationally, as the government has argued, until we have the situation secured, to have guns drawn while they get the situation under control and execute that arrest warrant." (ROA.609-10.)

- "[T]he officers acted in good faith, objective good-faith reliance on the administrative arrest warrant." (ROA.608.)

- "This was not a subterfuge just to really get on that property and start a criminal case. The very first email was, hey, we've got indications this person has overstayed; he is causing problems, and we . . . probably need to remove him if we can. It wasn't, . . . we need your help because we want to charge this guy with a crime and you're our entry into that world." (ROA.611.)

- "[T]he evidence established that the defendant was Mirandized before making the statements." (ROA.612.) For example, "the documentary evidence" like "the I-213" "indicate[d] and [said] twice . . . that the defendant was Mirandized." (ROA.607.)

- Malagerio "gave verbal consent to search. [O]ne officer and two agents testified consistently about that as well. So I do find that the search that resulted, and the evidence from it, is the result of a consent search." (ROA.612.)

Shortly after, the court issued a lengthy written ruling on the motion, memorializing these findings and also discussed in detail the Supreme Court's decision in *Abel v. United States*, 362 U.S. 217 (1960), which remains the Court's leading case applying the Fourth Amendment to the execution of an administrative immigration warrant at a residence. (ROA.238-56.) The district court explained that, in *Abel*, immigration officers entered the defendant's hotel room in the course of executing the warrant, whereas here the officers did not, and that *Abel* clearly allowed the officers to execute the warrant in the manner that occurred with Malagerio. (ROA.249-51.) The court further noted that, contrary to Malagerio's claim, Homeland Security regulations and training manuals do not prohibit the seizing of the target of an immigration arrest warrant in the manner that occurred here. (ROA.252-53.) Therefore, the court held that the officers relied in good faith on the administrative warrant in taking the actions they did to seize Malagerio outside of his home. (ROA.249-53.)

4.    **A jury convicts Malagerio, and the court imposes a 28-month sentence.**

Malagerio went to trial. He stipulated to all but one element of the offense, admitting that on the date of his arrest, November 3, 2020, he was "illegally or unlawfully in the United States," that he "knowingly possessed the firearms described in the indictment," and that those firearms "traveled in or

17

affected interstate or foreign commerce." (ROA.1090.)  Thus, the only

contested issue at trial was whether he knew he was in the United States

unlawfully at the time of his arrest.  (ROA.777-78.)  The jury found that the

United States proved this element and returned a guilty verdict.  (ROA.1069.)

The PSR calculated an advisory guidelines range of 27 to 33 months'

imprisonment, and the court imposed a 28-month sentence.  (ROA.1076,

1085.)

## SUMMARY OF THE ARGUMENT

This case is not about *Bridge of Spies* or the documentary *Tiger King*.  It is

simply about a Canadian citizen who stayed in the United States several years

past the expiration of his six-month visa and immigration officials' initiation of

a proceeding to deport him.  It is also about a straightforward legal issue: Did

the district court properly deny Malagerio's suppression motion related to the

firearms that authorities found when they executed the administrative warrant

to arrest him for deportation proceedings?  The district court's fact findings and

credibility determinations—made after a long suppression hearing at which it

received voluminous testimony and exhibits—strongly support its decision to

deny the motion, as does Supreme Court precedent and Fifth Circuit caselaw.

First, the district court correctly held that the officers did not seize

Malagerio in his home or its curtilage because he did not submit to their show

of authority until after he was out of his home and curtilage.  Second, the court

18

properly determined that, even if the officers seized Malagerio within his home or its curtilage, the officers relied in good faith on the administrative warrant they were there to execute, as their manner of execution was permissible under *Abel*, which remains binding Supreme Court precedent.  In reaching this determination, the district court—again based on its fact findings and credibility determinations—correctly rejected Malagerio's argument that the officers used the administrative warrant as a subterfuge for investigating criminal violations.  Finally, the court correctly held as a matter of fact that Malagerio consented to the search, and Malagerio's new argument—that although he consented, it was involuntary—fails to demonstrate any error, much less plain error.

For these reasons, this Court should affirm the denial of the suppression motion and the judgment.

## ARGUMENT AND AUTHORITIES

**The district court—based largely on fact findings and credibility determinations to which this Court owes great deference—properly denied Malagerio's suppression motion.**

### Standard of Review

"When reviewing the district court's denial of a suppression motion, [this Court] reviews conclusions of law de novo and findings of fact for clear error; the evidence is viewed in the light most favorable to the prevailing party."  *United States v. Gibbs*, 421 F.3d 352, 356-57 (5th Cir. 2005).  "One of

19

the most important principles in our judicial system is the deference given to the finder of fact who hears the live testimony of witnesses because of his opportunity to judge the credibility of those witnesses." *Id.* at 357 (quoting *Louis v. Blackburn*, 630 F.2d 1105, 1109 (5th Cir. 1980)). "Where a district court's denial of a suppression motion is based on live oral testimony, the clearly erroneous standard is particularly strong because the judge had the opportunity to observe the demeanor of the witnesses." *Id.* "Such credibility choices are clearly within the province of the finder of fact." *United States v. Kreczmer*, 636 F.2d 108, 110 (5th Cir. Unit B 1981).

A finding of fact is clearly erroneous when the court "is left with a definite and firm conviction that a mistake has been committed." *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." *United States v. McKinnon*, 681 F.3d 203, 207 (5th Cir. 2012) (citation omitted).

"In sustaining the denial of a motion to suppress, this Court may consider not only the evidence from the suppression hearing but also evidence presented during the trial." *See United States v. Basey*, 816 F.2d 980, 983 n.1 (5th Cir. 1987); *see also United States v. Huerta*, 770 F. App'x 169, 170 (5th Cir. 2019) ("In our review of the proceedings, we are not limited to the evidence presented at the hearing on the motion to suppress and may consider the entire

record."). And "[t]he district court's ruling should be upheld if there is any reasonable view of the evidence to support it." *Scroggins*, 599 F.3d at 440 (citation omitted).

<u>Discussion</u>

1. **The district court properly found that the officers did not illegally seize Malagerio in violation of the Fourth Amendment.**

   A. **Malagerio has not shown that the district court erred, much less clearly erred, in finding that officers did not seize Malagerio within his home or curtilage.**

Malagerio first contends that the officers unlawfully seized him in his home and that the search of his home and his incriminating statements flowed from that illegality. In fact, the court held a lengthy evidentiary hearing and made fact findings based on the voluminous testimony and exhibits that the officers did *not* seize Malagerio in his home or curtilage. Malagerio cannot show that those fact findings, which were based on the consistent testimony of three law enforcement officers as well as documentary and video evidence— were clearly erroneous.

As the district court stated on the first page of its order denying his motion, "the Court finds that officers did not seize Malagerio in his home." (ROA.238.) It correctly stated the standard for determining whether a seizure exists, reasoning that "'Supreme Court and Fifth Circuit caselaw makes clear that a Fourth Amendment seizure occurs in one of two ways: either an officer

applies physical force or an officer makes a show of authority to which an individual submits.'" (ROA.246-47) (quoting *Arnold v. Williams*, 979 F.3d 262, 268 (5th Cir. 2020).)  It then explained that, "[a]t the hearing, Malagerio conceded that officers did not enter his RV to arrest him," and he instead "claimed that he submitted to the authority of the officers within his home and, therefore, was seized within his home." (ROA.247.)  The court thus reasoned that "unless he submitted to the show of authority, Malagerio was not seized within his house under the Fourth Amendment." (ROA.247.)

Applying this authority, and after hearing all of the testimony and reviewing all of the exhibits, the court found as a matter of fact that "Malagerio did not submit to the authority of officers until he stepped away from his RV and followed commands to hold his hands above his head." (ROA.246.)  It explained the basis for this finding and cited the specific aspects of the testimony and evidence that it found persuasive:

> Malagerio testified during the suppression hearing that when officers arrived, he began dressing, even before they knocked on his door, because he wanted to see what was happening. Additionally, after officers knocked, Malagerio did not immediately follow the officers' commands and exit the RV; instead, he waited 60-90 seconds after the knock to exit.  Finally, as shown on the body-camera footage, when Malagerio exited, he did not immediately put his hands up as the officers ordered. Instead, Malagerio turned around and closed the door on his RV, and even lowered his hands to fix his shirt as he was walking away from the RV, in violation of the officers' orders.  Therefore, Malagerio submitted to the officers' authority only after he had

taken multiple steps away from his RV and finished fixing his
shirt.  Because Malagerio was not within his home or its curtilage
when he finally submitted, the Court finds that officers did not
seize Malagerio within his home.

(ROA.247 (court's record citations omitted).)

The court's findings track the testimony and evidence at the hearing.

Deportation Officer Rowden testified that he and another officer knocked on

the door, announced themselves as Immigration and Customs Police, and

asked Malagerio to come to the door.  (ROA.466, 496.)  Malagerio asked

"who is it?" and "kept taking his time to come to the door."  (ROA.466-67.)

Officer Rowden viewed this encounter as a "knock and talk," said that he

asked Malagerio to come to the door rather than commanded him, and

testified that Malagerio could have refused to come to the door if he had

wanted.  (ROA.496, 498, 516, 533, 540.)

After about 60 to 90 seconds, Malagerio opened the door and said, "hey,

what's this all about?"  (ROA.467, 517.)  For officer safety and given the

potential presence of a firearm or big cats, Deportation Officer Rowden and

other officials, displaying their weapons, told him to put his hands up.

(ROA.468.)  Malagerio did not comply immediately, beginning to put his

hands up but then putting them down to adjust his shirt, finally complying as

he moved toward his truck.  (ROA.1149 (GX 14).)  Once he was near the hood

of his truck, the officers handcuffed him for safety reasons.  (ROA.467-68, 517,

23

540-41.)  The court was well within its province in crediting this testimony and
evidence.  Malagerio has shown no clear error.

Malagerio unsuccessfully attacks the court's findings on two bases.
First, he contends, as he did in the trial court, that he was seized in his home
because the officers exhibited a show of authority by "commanding" him to
come out.  But, as the district court noted, a Fourth Amendment seizure does
not occur unless and until an individual submits to a show of authority.
(ROA.246-47.)  Malagerio's reliance on *Terry v. Ohio*, 392 U.S. 1 (1968), does
not prove otherwise.  (*See* Brief at 33-34, 48-49, 62.)  Rather, in *California v.
Hodari D.*, 499 U.S. 621, 629 (1991), the Supreme Court explicitly rejected a
*Terry*-based argument like Malagerio's.  There, the juvenile defendant threw a
bag of cocaine while being pursued by law enforcement, and, in the juvenile
proceeding that followed, the defendant moved to suppress the cocaine on the
basis that the officer's pursuit of him constituted a seizure, that the seizure was
unreasonable under the Fourth Amendment, and that the court must suppress
the evidence as the fruit of that seizure.  *Id.* at 623-24.  The trial court denied
the motion, an intermediate state court reversed, and the state supreme court
denied review.  *Id.* at 624.  The U.S. Supreme Court granted certiorari and
reversed the intermediate state court, holding that the defendant had not been

seized at the time he threw the cocaine because he had not yet submitted to the show of authority. *Id.* at 625-29.

> In reaching this conclusion, the Supreme Court explained:

> [The respondent's] defense relies . . . upon the proposition that a seizure occurs "when the officer, by means of physical force or *show of authority*, has in some way restrained the liberty of a citizen." *Terry v. Ohio*, 392 U.S. 1, 19 (1968) (emphasis added) . . . . The narrow question before us is whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield. We hold that it does not.

> . . . . [A]ssuming that [the officer's] pursuit in the present case constituted a "show of authority" enjoining [the defendant] to halt, since [the defendant] did not comply with that injunction he was not seized until he was tackled. The cocaine abandoned while he was running was in this case not the fruit of a seizure, and his motion to exclude evidence of it was properly denied.

*Id.* at 625-26, 629.

Here, the district court specifically focused on Malagerio's conduct that was inconsistent with his submission to a show of authority. As it explained, "Malagerio did not immediately follow the officers' commands and exit the RV; instead, he waited 60-90 seconds after the knock to exit." (ROA.247.) And "as shown on the body-camera footage, when Malagerio exited, he did not immediately put his hands up as the officers ordered"—instead, he "turned around and closed the door on his RV, and even lowered his hands to fix his shirt as he was walking away from the RV, in violation of the officers' orders."

(ROA.247 (discussing GX 14).)  The district court found, as a matter of fact, that "Malagerio submitted to the officers' authority only after he had taken multiple steps away from his RV and finished fixing his shirt."  (ROA.247.) Malagerio cannot demonstrate that these fact findings were clearly erroneous and has therefore shown no reversible error.

Malagerio contends, second, that even if he was seized outside of his home, the seizure occurred within the curtilage, where a driveway might have been had there been one.  (Brief at 24.)  Malagerio failed to preserve this issue because he never specifically argued that the curtilage was anything other than the porch of his home or asked the district court to apply the standards necessary to determine whether the land outside of his home where his truck was parked was curtilage.  (*See* ROA.53-66, 150-61.)  Therefore, this Court should review this argument for plain error.  *Puckett v. United States*, 556 U.S. 129, 135 (2009).

Malagerio has failed to meet even the first two prongs of that standard. First, he does not discuss the caselaw applicable to determining if an area is curtilage, and that law demonstrates that the area by Malagerio's truck was not.  "Whether a particular location is curtilage depends on four factors: the proximity to the home, whether the area is within an enclosure that also encapsulates the home, what the area is used for, and the 'steps taken by the

resident to protect the area from observation by [passers-by].'" *Evans v. Lindley*, No. 21-20118, 2021 WL 5751451, at *5 (5th Cir. Dec. 2, 2021) (quoting *United States v. Dunn*, 480 U.S. 294, 301 (1987)). Applying these factors shows that the area in which Malagerio's truck was parked was not curtilage. In *Evans*, for instance, this Court, applying these factors, held that "Evans' open driveway" and "the lawn beside it" were not curtilage because "Evans asserts no special usage that would confer curtilage status" or "describe[s] any steps he took to ensure the driveway, clearly visible from the street and surrounding neighborhood, was protected from observation." *Id.* For its conclusion, the *Evans* panel cited *United States v. Beene*, 818 F.3d 157, 162 (5th Cir. 2016), reasoning that *Beene* "compel[led] [the] holding here that Evans' driveway is not curtilage" because "[a]s in *Beene*, only the driveway's proximity to the residence weighs in favor of a finding that it was part of the curtilage of the home." *Id.* (citation omitted). The *Evans* Court also distinguished Evans's driveway and lawn from "the partially enclosed and set back driveway at issue in *Collins v. Virginia*, 138 S. Ct. 1663, 1670-71 (2018)." *Id.*

The same analysis applies here. Malagerio's truck was parked in an open area near his home—virtually the same situation as in *Evans* and *Beene*. Moreover, the area in which Malagerio's truck was parked was close to other

RV homes and not shielded in any way for privacy. (*See* ROA.1149 (GX 14).) The only factor in Malagerio's favor is the proximity of the area in question to his trailer. As in *Evans* and *Beene*, however, the area—unenclosed, open to public view, and without a use meriting special protection—does not constitute curtilage. The district court's finding that the area was not curtilage was not error, and it certainly was not clear or obvious error.

For these reasons, the district court did not clearly err in finding that Malagerio did not submit to any show of authority until he was outside his home and its curtilage, and therefore, even assuming it was unreasonable to seize him within his home or the curtilage, his seizure was reasonable.

## B.    Alternatively, the district court properly found that the good-faith exception applied to allow the officers to seize Malagerio pursuant to the administrative warrant.

The district court held that, even if Malagerio was seized by a show of authority within his home or curtilage, the seizure was lawful because the officers relied in good faith on the administrative warrant in doing so. (ROA.248.) The court based this holding on Supreme Court and Fifth Circuit law, and Malagerio has shown no error.

In *United States v. Leon*, 468 U.S. 897 (1984), "the Supreme Court held that the Fourth Amendment does not require the suppression of evidence obtained as a result of objectively reasonable reliance on a warrant." *United States v. Cherna*, 184 F.3d 403, 407 (5th Cir. 1999). In crafting the good-faith

doctrine, the *Leon* Court reasoned that "[p]articularly when law enforcement officers have acted in objective good faith or their transgressions have been minor, the magnitude of the benefit conferred on such guilty defendants offends basic concepts of the criminal justice system." 468 U.S. at 907-08.

Based on *Leon*, this Court first determines "whether the good-faith exception to the exclusionary rule announced in [*Leon*] applies, and if it does, the analysis ends." *United States v. Scully*, 951 F.3d 656, 664 (5th Cir. 2020). In applying the good-faith exception, this Court asks "[w]hat was the law at the time of the search, and secondly, was [the seizure] objectively reasonable in the light of the then-existing law?" *United States v. Aguilar*, 973 F.3d 445, 449 (5th Cir. 2020). This is because the Supreme Court has repeatedly emphasized that the exclusionary rule's "sole purpose" is to "deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236-37 (2011). Where officers have followed existing precedent, the "absence of police culpability" dooms a suppression claim. *Id.* at 240.

Here, the district court found that the good-faith exception applied because the officers were executing a valid administrative warrant and because Supreme Court precedent allowed the officers to seize Malagerio via a show of authority in his home or curtilage. (ROA.248-49.) The court first relied upon *Abel v. United States*, 362 U.S. 217 (1960), which "indicates that officers may

29

enter an arrestee's home to execute an arrest pursuant to an administrative warrant." (ROA.249 (citing *Abel*, 362 U.S. at 234-40).) In *Abel*, the FBI investigated a defendant whom it believed to be a Russian spy committing espionage. *Id.* at 221. The FBI notified INS of the defendant's suspected status as an illegal alien, and INS officers obtained an administrative warrant for his arrest. *Id.* at 221-22. INS officers planned to arrest the defendant at a hotel room where he lived and agreed to allow the FBI to attempt to interview him before making their arrest. *Id.* at 223. FBI agents initiated the encounter by knocking on the defendant's hotel room door, entering without invitation, and asking him questions. *Id.* After he failed to cooperate with the espionage investigation, the FBI officers signaled for the INS officers, who were waiting in the next room to arrest the defendant pursuant to the administrative warrant. *Id.* INS agents entered, arrested the defendant, and searched him and his room. *Id.* Even though the FBI tipped off INS and the arrest happened at the defendant's residence, the Supreme Court held that the arrest was valid under the authority of an administrative warrant, that the search incident to the arrest was valid, and that evidence found during the warrant's execution could be used for criminal prosecution. *Id.* at 234, 237, 239-40.

In finding that *Abel* supported the good-faith exception here, the district court reasoned that, "in contrast to the INS officers in *Abel*, the arresting

officers did not enter Malagerio's home.  Therefore, *Abel* indicates that the officers who arrested Malagerio acted reasonably when they knocked on Malagerio's door and arrested him only after he exited the RV."  (ROA.250.)

The district court also relied on *United States v. Smith*, No. 93-1543, 1994 WL 57613, at *1-2 (5th Cir. Feb. 17, 1994), which applied the good-faith exception to the execution of an administrative warrant.  In *Smith*, INS agents, in cooperation with FBI, DEA, and ATF, executed an administrative warrant on a deportable alien who had a previous felony conviction.  *Id.*  In a search incident to the arrest, the immigration agent found a loaded firearm in the defendant's pocket.  *Id.*  He was charged with possessing a firearm as a felon, and he moved to suppress the gun, "contending that it was seized from him pursuant to an unlawful arrest in violation of the Fourth Amendment."  *Id.*

The district court denied the motion, and Smith appealed, asserting that "the INS statute and regulations . . . authorizing his arrest pursuant to an administrative warrant[] do not satisfy" the Fourth Amendment because they do not provide for a warrant to be issued by "a neutral and detached magistrate who made a finding of probable cause."  *Id.*  This Court affirmed, reasoning that "[b]ecause we hold that the good-faith exception to the exclusionary rule applies, we do not reach th[e constitutional] issue."  *Id.*  The Court explained that the immigration officer "acted objectively reasonably in relying on" the

administrative warrant" and cited *Abel* in support for its "very similar facts." *Id*. In conclusion, the Court held that "the good-faith exception to the warrant requirement applies to shield the firearm seized from Smith from the operation of the exclusionary rule." *Id*. at *3.

Other Supreme Court and circuit opinions are in accord—holding in similar contexts that the good-faith exception applies in certain circumstances not involving magistrate-issued warrants. *See, e.g.*, *Illinois v. Krull*, 480 U.S. 340, 349-50 (1987) (applying good faith to officers' reliance on a statute, where no warrant at all was issued); *United States v. Hunt*, 893 F.2d 1028, 1032 (9th Cir. 1990), *unrelated part of the opinion withdrawn on reh'g*, 925 F.2d 1181 (9th Cir. 1991) ("Hunt's contention that an administratively issued warrant is constitutionally infirm is irrelevant so long as the police acted in good faith reliance upon the warrant process. The initial entry into the house was proper." (citing *Leon* and *Krull*)); *United States v. Lucas*, 499 F.3d 769, 788 (8th Cir. 2007) (Bye, J., concurring in part and dissenting in part) (applying good faith to an administrative warrant issued by a state department of corrections and relying on *Krull*).

As this discussion shows, the good-faith exception applies in this context, "the law at the time of the search" allowed officers to seize Malagerio in his home, and the seizure was "objectively reasonable in the light of the

then-existing law." *Aguilar*, 973 F.3d at 449.  This Court should therefore affirm the district court's application of the good-faith exception if it rejects the district court's finding that Malagerio was not seized in his home or curtilage.

Malagerio's main response is to claim that the officers obtained the administrative warrant as a subterfuge for pursuing a criminal investigation, which *Abel* reasoned would be improper under the Fourth Amendment.  *See Abel*, 362 U.S. at 225-26; *cf. Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 198 (5th Cir. 2009) (reasoning "that an administrative inspection is a sham if it is 'a pretext *solely* to gather evidence of criminal activity'" (quoting *United States v. Johnson*, 994 F.2d 740, 742 (10th Cir. 1993) (emphasis in *Club Retro*))).  "[T]he question of whether this administrative [action] was a pretext for an illegal purpose is a factual question."  *Bruce v. Beary*, 498 F.3d 1232, 1242 n.19 (11th Cir. 2007) (citing, *inter alia*, *Abel*, 362 U.S. at 225-30).

Here, the district court found as a matter of fact—based on the officers' testimony and the evidence presented—that Deportation Officer Rowden obtained the administrative arrest warrant and executed it to initiate deportation proceedings against Malagerio, not to gather evidence of a crime— and certainly not "solely" to gather evidence of a crime.  The court found that, while the officers suspected that Malagerio might have a firearm (or exotic animals) in his home and prepared accordingly for their own protection and

33

because of the possibility that some criminal activity might become apparent during the course of the warrant's execution, the warrant's *purpose* was to initiate deportation proceedings. As the court explained:

> At the hearing, the government presented the email from Stephens to show that officers started investigating Malagerio for the purpose of removal. Additionally, Raymond testified that fugitive operations led the charge to arrest Malagerio and that HSI, which only gets involved in deportation proceedings if there is a possibility of criminal charges, was present at the arrest only as support. This evidence indicates that the decision to proceed toward deportation was not influenced by or carried out to amass criminal evidence.

(ROA.250-51 (court's record citations omitted); *see supra* pp. 3-8.)

The record strongly supports these findings. For example, HSI Special Agent Raymond testified at trial that, when he was notified of Malagerio's "possible overstay," he referred the issue to Deportation Officer Rowland at ICE-ERO because HSI does "the long-term criminal conspiracies and stuff like that" and does not "particularly spend a lot of time on just someone who is out of status." After he forwarded the information to ERO, "Officer Rowden began his investigation." (ROA.826-27.) He later explained that they had no wiretaps on Malagerio's pre-arrest calls because "[t]his started as an immigration case," so the only recorded calls authorities obtained related to the eventual criminal case were "jail calls" Malagerio made after the criminal prosecution was initiated. (ROA.848.)

Malagerio does not establish that the court's fact findings, which were based on this evidence in the record, were clearly erroneous. Rather, he simply points to the fact that, before they executed the warrant, immigration officers were concerned that Malagerio might have a firearm based on the 2017 social media photo. But Malagerio ignores that Deportation Officer Rowden discovered the photo in assessing the operational risk of the arrest, not because he was attempting to make a criminal case. (ROA.457.) And even if the photo gave rise to a suspicion that Malagerio might have been violating the law by possessing a firearm as an illegal alien, "[a]n officer's suspicions about criminal wrongdoing do not . . . render an administrative [action] pretextual." *Club Retro, L.L.C.*, 568 F.3d at 198 n.7; *cf. United States v. Thomas*, 973 F.2d 1152, 1155-56 (5th Cir. 1992) ("Administrative searches conducted pursuant to valid statutory schemes do not violate the Constitution simply because of the existence of a specific suspicion of wrongdoing."); *New York v. Burger*, 482 U.S. 691, 716 (1987) ("The discovery of evidence of crimes in the course of an otherwise proper administrative inspection does not render that search illegal.").

Malagerio further misunderstands that it was not improper for HSI officers to accompany the immigration officers to Malagerio's home in case it turned out that Malagerio illegally possessed a firearm, nor was it improper for

state game wardens to accompany the team because of the real possibility that Malagerio might have big cats in his home that might attempt to injure one of the other teammembers during the course of the warrant's execution. Malagerio's criticism of this team overlooks the real danger—both from firearms and wild animals—to those seeking to execute the administrative warrant.  As the district court recognized, "[t]here [we]re some unique facts here"—" we have tigers and lions possible, possibly around" and "Intel indicating that this person was illegally present in the United States and had a firearm."  (ROA.609.)

Additionally, Malagerio insists that the coordination of multiple agencies in Malagerio's arrest, and the later criminal charge, were enough to overturn the district court's fact findings.  But the Supreme Court's *Abel* decision held that intra-agency coordination of a much greater degree was not improper.  As the *Abel* Court reasoned about the FBI's and INS's coordination:

> The Government has available two ways of dealing with a criminally suspect deportable alien.  It would make no sense to say that [federal agencies] may not cooperate in pursuing one course of action or the other, once it is honestly decided what course is to be preferred.  For the same reasons this cooperation may properly extend to the extent and in the manner in which the F.B.I. and I.N.S. cooperated in effecting petitioner's administrative arrest. Nor does it taint the administrative arrest that the F.B.I. solicited petitioner's cooperation before it took place, stood by while it did, and searched the vacated room after the arrest.  The F.B.I. was not barred from continuing its investigation in the hope that it might result in a prosecution for espionage because the I.N.S., in the

discharge of its duties, had embarked upon an independent
decision to initiate proceedings for deportation.

*Abel*, 362 U.S. at 229.

And, in fact, at trial, Deportation Officer Rowden explained that that

was how this case unfolded:

> Q. [Defense counsel] talked a little bit about you doing the
> immigration side of the investigation.  Is that part correct?
>
> A. That's correct, sir.
>
> Q. And once we had the alien in possession of a firearm case, did
> you investigate that case or did Special Agent Tim Raymond do
> that?
>
> A. Special Agent Raymond did.
>
> Q. So he was responsible for that portion of the investigation?
>
> A. Correct, sir.

(ROA.822-23.)  As *Abel* demonstrates, there was nothing improper about this,

and the district court was correct in reaching that conclusion.

Finally, Malagerio's claim that *Abel* is no longer good law is simply

wrong.  This Court cited *Abel* as recently as 2019 for the proposition that "[i]t

is undisputed that federal immigration officers may seize aliens based on an

administrative warrant attesting to probable cause of removability."  *City of El*

*Cenizo, Texas v. Texas*, 890 F.3d 164, 187 (5th Cir. 2018) (emphasis removed)

(citing *Abel*, 362 U.S. at 233-34); *see also Club Retro, L.L.C.*, 568 F.3d at 198

(discussing *Abel* in the context of administrative searches); *Smith*, 1994 WL 57613, at *2-3 (discussing *Abel* in depth).

Therefore, consistent with recent Fifth Circuit precedent, the district court properly applied *Abel* in this context. And based on the record created at the suppression hearing, the district court found that this was not a case where the "administrative warrant was here employed as an instrument of criminal law enforcement to circumvent the latter's legal restrictions, rather than as a bona fide preliminary step in a deportation proceeding." (ROA.251.) It was correct—and certainly did not clearly err—in doing so.

### C. Assuming the good-faith exception does not apply, the seizure was nevertheless legal.

Finally, even if this Court were to find that the officers seized Malagerio within his home or curtilage and that the good-faith doctrine does not apply, the officers' conduct in seizing Malagerio was not a Fourth Amendment violation because it was done pursuant to an administrative immigration arrest warrant. *See United States v. Dunigan*, 555 F.3d 501, 508 n.12 (5th Cir. 2009) ("[I]t is an elementary proposition, and the supporting cases too numerous to cite, that this court may affirm the district court's judgment on any grounds supported by the record."). "A valid arrest warrant carries with it the implicit but limited authority to enter the residence of the person named in the warrant in order to execute the warrant, where there is reason to believe that the

suspect is within." *United States v. Route*, 104 F.3d 59, 62 (5th Cir. 1997) (citation omitted). Although Malagerio suggests that this law does not apply to administrative arrest warrants not issued by a neutral and detached magistrate, he cites no cases supporting that proposition. To the contrary, "deportation itself is a civil matter to which the constitutional protections applicable to criminal prosecutions do not apply." *United States v. Koziel*, 954 F.2d 831, 835 (2d Cir. 1992). This is because deportation is a "*civil* penalty." *Id*.

Because deportation is civil rather than criminal, Fourth Amendment concerns would appear not to apply—or at least not with the same force as in criminal proceedings. In *Abel*, 362 U.S. at 236-37, for instance, the Supreme Court addressed this issue in the analogous context of searches, reasoning:

> If anything, we ought to be more vigilant, not less, to protect individuals and their property from warrantless searches made for the purpose of turning up proof to convict than we are to protect them from searches for matter bearing on deportability. According to the uniform decisions of this Court[,] deportation proceedings are not subject to the constitutional safeguards for criminal prosecutions. Searches for evidence of crime present situations demanding the greatest, not the least, restraint upon the Government's intrusion into privacy; although its protection is not limited to them, it was at these searches which the Fourth Amendment was primarily directed. We conclude, therefore, that government officers who effect a deportation arrest have a right of incidental search analogous to the search permitted criminal law-enforcement officers.

*Id.*; *see also United States v. Lucas*, 499 F.3d 769, 777 (8th Cir. 2007) (en banc) (plurality op.) (holding that it was constitutional for officers to arrest the defendant in his home pursuant to an administrative arrest warrant and reasoning that "a[n arrest] warrant issued by a neutral and detached [judicial] magistrate was not required for a lawful entry into [the] apartment").

Given this guidance, at minimum, the officers executing Malagerio's administrative arrest warrant had a "right of [seizure] analogous to [a seizure] permitted criminal law-enforcement officers." *Abel*, 362 U.S. at 237. That means the officers could seize Malagerio by show of authority in his home or curtilage. And as the district court found, the manner in which the officers executed the warrant—by never physically entering Malagerio's home but instead speaking to him from outside—did not violate any of the internal ICE regulations or policies that the parties offered into evidence. (ROA.252-53.) Therefore, the officers acted reasonably and did not violate the Fourth Amendment in seizing Malagerio and in then obtaining his consent to search his home, in which they recovered the three firearms that served as the basis for his conviction.

## 2. Malagerio consented to the search of his home, resulting in the discovery of three firearms.

For the first time, Malagerio argues that his consent to search was involuntary because of the allegedly coercive circumstances (handcuffs, officers

with firearms) around him at the time he consented.  This was not his claim in the district court.  Rather, as the district court observed in its order denying his suppression motion, *Malagerio does not contest the voluntariness of his consent* or whether he had actual or apparent authority to consent; instead, he alleges that he did not give consent in any way."  (ROA.255 (emphasis added).)  In other words, in the district court, Malagerio argued only that at no time did he tell the officers they could search his RV.  (ROA.255.)  This Court should therefore review his new voluntariness argument for plain error.

"[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent."  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  "[T]o satisfy the consent exception, the government must demonstrate that there was (1) effective consent, (2) given voluntarily, (3) by a party with actual or apparent authority."  *United States v. Scroggins*, 599 F.3d 433, 440 (5th Cir. 2010).  This Court applies "a multi-factor test to determine whether consent was voluntary," in which it considers "(1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will

be found." *United States v. Bass*, 996 F.3d 729, 739 (5th Cir. 2021).  No single factor is dispositive or controlling.  *See id.*

"The voluntariness of consent is a question of fact to be determined from the totality of all the circumstances.  [When the issue of consent is preserved, this Court] will not reverse the district court's finding that consent was voluntary unless it is clearly erroneous." *United States v. Kelley*, 981 F.2d 1464, 1470 (5th Cir. 1993) (citation omitted).  Moreover, even if "there was conflicting testimony at the suppression hearing regarding the timing and scope of consent, [this Court] defer[s] to the district court's credibility determinations and factual findings." *United States v. Marin-Hipolito*, 434 F. App'x 346, 347 (5th Cir. 2011).

As with his argument related to seizure, Malagerio ignores the overwhelming evidence and testimony that support the district court's fact finding that he consented to the search of his home.  As the district court reasoned:

> Here, three credible witnesses testified that Malagerio consented to a search of his RV before officers began the search and even helped officers find his guns and identifying information during the search.  Only one witness, Malagerio, testified that the officers did not obtain consent to search.  Additionally, the government produced a consent form, signed by Malagerio, memorializing his consent.  Finally, Malagerio's jail calls confirm that he gave consent to search.  In those calls, Malagerio states that he gave up his shotgun, was more than cooperative, and had no issue with giving up his guns.  Also, Malagerio did not state in any of his jail

> calls that the officers needed a warrant to search his RV or that he
> did not consent to a search.

(ROA.255-56 (court's record citations omitted).)  As this discussion shows,

several factors supported the finding that Malagerio's consent to search was

voluntary, including that he was cooperative with the officers and that

Malagerio did not believe his possession of the firearms was illegal so he was

not concerned about providing them consent to search the RV for them.  (*See*

*supra* pp. 3-14.)  Additionally, the officers worded their request to consent in

such a way that Malagerio would have known he had a right to decline, and

the record suggests he was of normal intelligence and was not uneducated.

(*See id.*)

Malagerio's arguments on the voluntariness of his consent ignore or

contradict this testimony and evidence, which cannot prove any error, much

less clear or obvious error.  For example, although he repeatedly claims that he

was "terrified" when he encountered the officers, (*see, e.g.*, Brief at 55), the

district court found Malagerio not credible, and the officers testified

consistently that, after his seizure, Malagerio was calm and cooperative and

that his consent was voluntary.  (ROA.240; *see supra* pp. 10-14.)  And his

reliance on the body-cam footage of the arrest fails because it stops a few

seconds after he emerged from his RV and thus does not depict anything that

occurred after the officers seized Malagerio, including when he gave consent to

search and was read *Miranda* warnings. (ROA.1149 (GX 14).) Finally,

contrary to Malagerio's claim, the officers' testimony on consent was not

"internally inconsistent" in any material respect, (*see supra* pp. 3-14), and even

if it were, "this Court "defer[s] to the district court's credibility determinations

and factual findings" in such a situation. *Marin-Hipolito*, 434 F. App'x at 347.

In sum, the record clearly supports the district court's fact finding that

Malagerio voluntarily consented to the search. Malagerio simply cannot show

any error, much less a clear or obvious error under the plain-error standard.[2]

---

[2] Finally, this Court can affirm the seizure of the firearms even if it finds that the officers' seizure of Malagerio was initially unconstitutional. This is because "the consent [to search] was an independent act of free will" apart from the allegedly illegal seizure of Malagerio's person. "To determine if consent was independent, this [C]ourt" analyzes the record in light of three factors: "1) the temporal proximity of the illegal conduct and the consent; 2) the presence of intervening circumstances; and 3) the purpose and flagrancy of the initial misconduct." *United States v. Montgomery*, 777 F.3d 269, 273 (5th Cir. 2015) (citation omitted). "The absence or presence of one of these factors is not a per se indication of free will sufficient to break the causal connection between the illegality . . . and the evidence sought to be suppressed." *Id.* (citation omitted). The first factor might favor Malagerio because the allegedly illegal conduct in seizing him within his home or curtilage immediately preceded the officers' request for consent to search his RV. But the other two factors do not. In terms of intervening factors, the officers asked for consent to search the RV after Malagerio moved to an area by his truck, which—under the precedent discussed earlier—was not within his home's curtilage. Thus, at that point, pursuant to the administrative search warrant, the detention was indisputably legal. As to the second factor, even assuming officers unconstitutionally seized Malagerio within his home or curtilage, their conduct was not "flagrant"—rather, they seized him pursuant to an arrest warrant and without physically entering his home. Thus, on the whole, the factors demonstrate that Malagerio's consent was an independent act of free will, given because he wanted to cooperate with the authorities and he did not think his possession of the firearms was illegal. (*See supra* pp. 10-14.)

## CONCLUSION

This Court should affirm the district court's denial of the suppression motion and affirm the judgment.

Respectfully submitted,

Chad E. Meacham
United States Attorney

*s/Leigha Simonton*
Leigha Simonton
Assistant United States Attorney
Texas Bar No. 24033193
1100 Commerce Street, Third Floor
Dallas, Texas 75242
Telephone: (214) 659.8600
leigha.simonton@usdoj.gov

Attorneys for Appellee

## CERTIFICATE OF SERVICE

I certify that this document was served on Malagerio's attorney, Mary Margaret Penrose, through the Court's ECF system on January 14, 2022, and that: (1) any required privacy redactions have been made; (2) the electronic submission is an exact copy of the paper document; and (3) the document has been scanned for viruses with the most recent version of a commercial virus scanning program and is free of viruses.

*s/Leigha Simonton*
Leigha Simonton
Assistant United States Attorney

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 9,980 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Calisto MT font.

*s/Leigha Simonton*
Leigha Simonton
Assistant United States Attorney